2460 from the District of South Dakota, Charles Sisney et al. v. Denny Kaemingk et al. Court will hear from Mr. Mars. Your Honor, I'm the appellee in this case. I believe Ms. Sirska goes first. I may be wrong. You're correct. I misread my thing. Thank you very much. I appreciate that. Ms. Sirska. Thank you, Your Honor. May it please the Court and Counselors, Appellants respectfully request to reserve three minutes for rebuttal. The District Court erred in failing to accord the requisite deference that prison officials must have in determining the adverse effects likely to result from allowing materials depicting nudity and sexually explicit written materials within the walls of the prison. The District Court instead went outside the parameters of the record and common sense by ignoring a long line of case law and then rewrote the Department of Corrections pornography policy substituting the Court's knowledge and love of art instead of the officials who deal with the day-to-day issues inside the penitentiary. Determining whether the policy revised in 2014 is constitutional, this Court has applied the Turner analysis to the policy when determining whether the regulation that impinges on inmates' constitutional rights is reasonably related to legitimate penological interests. As noted in Turner, the Courts are ill-equipped to deal with the increasingly urgent problems of prison administration and reform. The Court must accord great deference to the judgment of prison officials, particularly with respect to decisions that implicate institutional security. The Supreme Court and this Court have held that the burden is not on the defendants to prove the validity of the present regulations but on the challenger to disprove it. The District Court erred in finding that the 2014 policy does not meet the first factor that the regulation is rationally related to legitimate penological interests as applied to the challenged nudity and erotica. You had the burden of proving that rational connection, right? It's the burden for SISNY to disprove the rational connection. However, it is rationally connected and related to the penological interests because by allowing nudity and sexually explicit material, it allows for trading and bartering and it may become currency and then that would be a danger for any of those inmates that be in possession of the pornography. Those are all common sense arguments, though, right? Not based on evidence that was put in the record. That's correct, Your Honor. However, in the record, there have been citing to case laws such as King v. Dooley that recognize that having nudity within the walls of the prison does have happened,  Well, tell me, how does common sense support the inhibition of rehabilitation or jeopardizing the prison security for inmates to be able to look at pictures of Michelangelo's David or the Sistine Chapel? Your Honor, the common sense argument regarding that would be that it is full frontal nudity and it's not the fact that it's artwork. It's the fact that it's nudity and that even a single nude picture is just as likely to have an adverse effect on legitimate penological objectives as allowing an inmate to possess any publication of multiple images. As found in other courts exposing already angered men to nonviolent nudity or pornography, it can lead to short-term increases in their aggressiveness. And one could reasonably conclude that that pornography increases the risk of prison rape and creating a hostile work environment for prison staff. Having nudity within the walls of the prison can risk recidivism for rehabilitation for sex offenders and the rehabilitation for sex offenders greatly outweighs the inmates' desires to obtain nudity or pornography. Counsel, it's your position that if there's even one reference to nudity in a book, that that could cause disorder? I'm paraphrasing your brief. Yes, Your Honor, because as held in Thornburg, the court upheld the all-or-nothing rule and that's important for prison officials to have that all-or-nothing rule because it would not be feasible to be able to look through every page, page by page, of a document to see if there's another instance of nudity. Furthermore, if just one article or a piece of nudity can become piracy and can be used for trading and bartering, which can be, would be turned into... Now, I think you retreated quickly to a picture and I was worried about books more. Here, let me focus on books with you. Your Honor, are you talking about like the sexually explicit written material? No. The fact of the matter is, here in this case, Mr. Sisney requested erotica. And this erotica is, it's featured to, and the purpose of it is to arouse the reader. And that has the same effect as pornography, if not even more. Okay, you know what I'm going to say, doesn't include the Bible and Walt Whitman and Ulysses and... Let's start with the Bible. Yes, Your Honor. Doesn't that include the Bible? I mean, they wouldn't let us as kids read Song of Solomon until we were about 15 or 16 until we could understand it was really about two other entities and not people. So, didn't that include the Bible? No, Your Honor, it doesn't include the Bible. Now, tell me why not? In fact, the Bible is in the prison library right now, and I believe also in the chapel. And it doesn't include the Bible because the Bible is not... The purpose of the Bible is not the sexual arousal of the reader. And if there's arguments that there is sexually explicit material within the Bible, that's not what is here today. Who determines purpose, counsel? Who determines purpose? Are we having the mailroom people read the book and say, well, the purpose of this is not for sexual arousal, so I'm going to let this one in. The purpose of that one is, though, and that's going in the censor file. Your Honor, the policy and what happens is the prison officials that review the material, if they think that there is nudity or sexually explicit written material, they'll flag it and then have the associate warden review it as well. And in the matter at hand here, we're talking about two books that are titled The Thrones of Desire and Pride and Prejudice, The Wild and Wanted Edition. And those are clearly erotica. And I believe one of the books even says that it's titillating. And the district court did acknowledge that those books could be titillating to some as well. Well, let me ask you this. I'm going to even go a step further. I'm going to judge Benton's question and say, not only do we have the Bible, but presumably if your spouse writes you a letter where the spouse says something like, you know, I miss laying next to you and, you know, feeling your heartbeat against mine and there might be some, it doesn't quite rise to the level of erotica, but it could be used potentially to arouse. Doesn't that, I mean, don't we have the same problem? We're going to have a mailroom or a prison official saying you can't see this letter from your wife or husband because you could barter it and trade it because it looks too much like it could arouse somebody? Your Honor, and this is why the court must accord great deference to the judgment of the prison officials. And the fact of the matter is today in this matter, we have two cases that are undeniably erotica. And this is, and the matter of this case law or this matter today is that because the purpose is arousal, that is why it must be banned within the walls of the prison. And in the purpose of the erotica that was banned, the district court erred in their alternative, in the alternative test, in the second Turner factor stating that there's no alternative means of exercising the right to read literature that had sexual content. And that's not the test that we are here today on. The correct test would be whether there are alternatives, alternative means of exercising the right to read books and publications. And in fact, as in Belle v. Young, the district court held that there is a library of just about 5,000 books that SISNY can read. And other courts have held, such as in Gray v. Cannon, that upheld the rejection of a book called Celebrity Skin and stated that they can read any other book that's not containing any sexually explicit material that would be a risk to the security and order of the prison. Counsel, I just want to ask you this. So it seems to me that, you know, in this case, there are some things that would clearly fall over the line, you know, that prison officials could ban. I mean, I don't think there's a question about that, but I think, or maybe there is, I don't know. I mean, it was a question below, but I think that the problem I'm having and that Judge Benton seems to be having, although I don't want to speak for him, is that it bans a whole lot of other stuff too. That maybe doesn't cross the line. And it seems to me there's an over-breath challenge here, and you're not directly addressing the over-breath challenge. And I'm just trying to figure out, is this so broad that it steps over the line, even if, as you say, there are some things in this case that could have been banned under a more restrictive or narrower policy? No, Your Honor. The regulation is not over-broad. And that goes to the facial challenge, which, because Azizi did not disprove the Turner factors, his as-applied challenge fails. However, using the hypothetical of the Bible or Hemingway or other works such as that, it's not feasible that prison officials would go through the book word-by-word and read and find a simple sentence or a simple passage that they think is sexually explicit. That's just not going to happen. We don't have those kind of resources. And going back to a previous policy is not a least restrictive alternative because it undermines the deference that must be afforded to prison officials. And the prison officials need to be flexible and to adapt to further penological interests. Furthermore, the district court inserted itself as an expert of the arts and not taking into account the problems that are within the prison walls and substituted its knowledge and love of the arts instead of the officials who are dealing with everyday issues. In Reynolds v. Cook, a Connecticut court examined a two-tiered system that the district court now proposes or orders. And they held that allowing pictorial depictions of nudity and not explicit sexual activity would not work because of the implementation would require an ongoing subjective monitoring system to determine what materials would be allowable and such a system would be difficult, if not impossible. It would result in inconsistent implementation of the policy and would be financially costly and labor-intensive. Mr. Skysee, you're well into your rebuttal time. Would you like to reserve some time? Yes, Your Honor. Thank you. Very well. Mr. Morrison, now it's your turn. Thank you, Your Honor. Members of the court, good morning. My name is Stephen Morrison and I represent Charles Disney. Let me make one response to the state here regarding the first Turner factor. It absolutely is the state's burden under the law to prove a reasonable relationship under Turner's factor one. And that reasonable relationship is not the type of relationship we think of when we think of equal protection rational basis where the state can come up with post hoc rationalizations. No, the state has to demonstrate actual legitimate penological interests, which they have here, security and rehabilitation. And they have to demonstrate an actual connection with real problems. And the record here, the factual record here comes in two parts. One, there's no apparent institutional danger whatsoever. There's nothing in evidence about that. And two, the prison restricted and continually restricts an incredibly wide swath of speech. You know, the record is replete. Judge Benton, you mentioned the Bible. The state and the district court conceded that the Bible is bannable under this policy. Now, whether it's in the library or not, I have no idea. But we do know that a text called biblical archaeology was prohibited for being sexually explicit. I filed that. I mentioned that in my May 19th filing asking for contempt when I discovered that rejection log that should have been provided to Mr. Cisney and Discovery. And by the way, that rejection log lists texts that are rejected, why they're rejected, and the actual page numbers on which appear the sexually explicit. Okay, so stay away from the overbroad level. Go to a very narrow as applied. I think we're in this business. Like the Supreme Court in the 1960s, I think. But they did have specific evidence about thrones of desire and pride and prejudices, wild edition. Why don't they, at least on as applied, get to ban those two books? They didn't have specific evidence regarding the negative ramifications of those texts. You know, the government calls them erotica. That's fine. I've reviewed pride and prejudice, and it's shockingly tame. I won't say that about... Now, we understand you don't get to decide. All they need is a valid rational connection, right? That's what Turner says. You need more than that. Oh, are you sure? I thought Turner said valid rational connection. That's the language. This is prong one, prong one of Turner. That's the language, but we have to be very careful not to apply the equal protection notion of rational basis. We're not going to do that. Go ahead. Okay, so the state simply refused to adduce any evidence at district court that there was any institutional danger. Cisney asked, and as the district court said many years ago, the state stonewalled Cisney. So Cisney... In Carpenter, though, Mr. Morrison, in Carpenter, didn't we say that the prison can censor material that has the primary purpose of sexual arousal? And isn't it fair to say that passages in the Thrones and Pride and Prejudice have the primary purpose of sexual arousal? Two points to that. One, I'm bemused at the government's use of this purpose rationale, because that appears nowhere in the policy. So at this point, that's not the policy that's a question. As far as Thrones of Desire and Pride and Prejudice goes... We're also talking about an as-applied challenge now, as Judge Benton just pointed out. We are, and again, purpose is no criterion in this policy we're considering, and... But it's as-applied. Courts... Don't go to the policy. Tell me about how those two books survive Carpenter. One, courts have uniformly excluded written material from any pornography ban. That includes federal penitentiaries, and that includes other state institutions. So that's the legal argument. And two, the state would like to make this jump from images to texts, in terms of how they might undermine rehabilitative efforts and security. But they haven't presented any evidence that inmates are running around putting books in front of female guards and taunting them. As far as the evidence goes, that danger simply does not exist. So... Could part of it be, though, the fact that there's been a ban of some sorts for the last, I don't know, 20 years? And so a lot of this stuff isn't getting through. I mean, how do you prove sort of a negative, a counterfactual? What would happen if people were running around with pornography in the prison? Yeah. Well, I mean, I suppose that's a good question. But the state in the district court and the state today is busy alleging all of these, this parade of horribles, but there's simply no evidence of it. We had the King policy back in the day. That was upheld. And presumably, when the state defended that policy, it presented actual evidence. Sisney is simply saying, I've got these texts. Yes, pretty face. Yes, thrones of desire. But also images of the Sistine Chapel, Parisian art, Picasso. And court, I'd like you to take a look at this policy. And what did Sisney do? In discovery, he asked the prison, pursuant to the rules of civil procedure, hey, what problems have you had? And the prison not only said none or a lot, the prison simply refused to respond and refused to abide by a court order to respond. And so, yeah, how do you prove a negative? Well, you prove it through discovery. And the state decided not to participate. So here we are again on the second round. And what do we know? We know that this policy has been used to prohibit Parents Magazine, Biblical Archaeology, a text on the Holocaust, Architectural Digest, and Scientific American, all of which supposedly contain sexually explicit material. Oh, except the text on the Holocaust, because that contains nudity throughout. And the prison decided that inmates should not be able to read about the Holocaust in World War II. And I'm sorry if I'm getting flustered, but that makes me angry. But beyond that, let's take a look at what the district court actually did. Well, let me ask you this. I think you were about to mention something on Thrones of Desire and what was in there. I mean, don't you think that things like Thrones of Desire, and let's take it a step further, you know, pornography, that certainly the prison can ban that. I mean, are you seriously saying that they should have banned Thrones of Desire? And that's just a hypothetical and things like that. I'm simply looking at the consistent federal case law around the country that excludes written material, that prohibits prisons from prohibiting written material. That's simply the consistent case law. And South Dakota now wants to, basically for the first time, ban written materials. Okay, let it prove its case. CISNY tried to put it to its case, but they refused. And so we're in a situation now where we've got written material. No federal appellate court has ever, to my knowledge, upheld a ban on written material, even if it's sexually explicit. I don't know what else I can say about that, except if this court decides to reverse the district court on that front, it would be a first, to my knowledge. I just want to note very quickly what the district court's effect is. It separates sexually explicit material from nudity. At its base, that's what it does. What does that mean? It means Pretty Face is banned. National Geographic is not. Playboy is banned. Picasso is not. True Pornography is banned. The Bible and the Sistine Chapel are not. And it would allow inmates who can't right now under this policy read text on the Holocaust, text on biblical archaeology, Bloomberg Businessweek, which was prohibited, parenting magazines, magazines about camping and fitness, and all sorts of other things. I mean, this court is well aware of the wide swath of documentation that's been prohibited. And I see my time is up, and I want to make sure Mr. Carreras has his full five minutes, so I will rest on that. Thank you, Your Honors. Very well. Thank you, Mr. Morrison. Mr. Carreras, under the supervision of Professor Volokh. You're muted, Professor. Rookie mistake. I'm Eugene Volokh. I represent Amicus National Coalition Against Censorship. I'm supervising Alberto de Diego Carreras, who is going to present the argument. Good morning, Your Honors, and may it please the court. Our focus as Amicus is on the facial over-breath challenge. The 2014 policy is substantially over-broad in three ways. First, it captures written, not just visual materials, as has been discussed, and it does so without exception, because note that the exceptions for medical, anthropological, or educational materials do not apply to written works. They only apply to visual depictions. This makes this policy broader than virtually every other policy that has been considered by courts outside of the sex offender context, which I'll address in a moment. Indeed, those policies that have been upheld by courts have been less restrictive in this respect, and in upholding them, courts routinely recognize the fact that those policies did not cover written materials as part of the reason that they were constitution. These are cases like Morrow and Amatel. Now, on the other hand, where policies have restricted written materials, courts have struck them down, especially whereas here no exception for artistic works existed. These are cases like Klein and Couch. Now, in the sex offender context, policies broadly restricting written materials have been upheld, but these cases are meaningfully different and in opposite in obvious ways. First of all, the state has never asserted the rehabilitation of sex offenders as their stated goal for this policy in this case. Secondly, as the Third Circuit recognized in Ramirez v. Pew, for example, even though the policy restricting sexually themed materials and the rehabilitation of sex offenders is obvious, that connection becomes attenuated upon consideration of the entire population of inmates, and this really gets to the heart of the matter, Your Honors, because it comes down to common sense. Even under appellant's contention that common sense is the sole basis upon which we should determine whether their policy satisfies Turner, it simply defies common sense that original sociological works such as Gums, Germs, and Steel, which has been banned by the policy, or a play by Shakespeare, for example, or indeed the Bible, should be banned as pornography, when if anything, these are high value works with the power to edify and educate prisoners and indeed aid in their rehabilitation rather than interfere with it. Now, the policy is also overbroad for a second reason, which is that it bans materials that contain even a single mention of sexual content irrespective of its broader context, and here I want to focus briefly on the state's reliance on Thornburg. The state claims that the 2014 policy was fine because Thornburg upheld all or nothing policies, said that their constitution. The policy as revised by the district court is an all or nothing policy that comes squarely under Thornburg, and the 2014 policy that CISNY challenges here goes against what Thornburg said. Thornburg said an all or nothing policy is constitutional so long as there is a determination that the content being banned would disrupt prison security or whatnot. Mr. Farris, can I ask a question? Do federal courts really have the power to rewrite a state regulation like this? Well, Your Honor, I think rather than invalidate the entire policy, courts regularly try to save policies by doing this sort of thing, and indeed here all the district court did was reinstate language from the prison's own prior policy and align it with the policies of the Federal Bureau of Prisons and as well as the policies of numerous other states cited on page 15 of our brief. So, and again, it aligned it with Thornburg because Thornburg said all or nothing policies are okay so long as there's this determination. Counsel, isn't there a difference, though, between severance and rewriting? I mean, you know, severance is penciling out something and taking it out. Here, we don't just have taking out. We have taking out and adding back in, and that seems to me to just be too much to get to Judge Gronder's question. Sure, Your Honor. Again, I think the court was endeavoring to save the policy, not to engage in policymaking, and the court was faced with a decision either invalidate this part of the policy entirely on its face or attempt to save it by reintroducing the government's own language, language that, again, tracks the language of policies that have been upheld as constitutional all around the country. The policy is an all or nothing policy as rewritten by the district court and was an all or nothing policy violative of Thornburg prior to these revisions because it would allow a policy to be discarded solely on the basis of sexual content even if there wasn't a finding that it would cause institutional disruption. And, Your Honors, I see that I am out of time, so unless there are further questions, thank you very much. Thank you, Mr. Carreras. Ms. Surska, I believe you have a little rebuttal time. Thank you, Your Honor. Appley is a site to a variety of different publications that are not in the record for this matter today, and this is the Thrones of Desire and Pride and Prejudice Wild and Wanton Decision. We don't have to prove that there are or were issues at the time. It's the risk of the security and order of the prison. Appley has stated that we did not provide evidence of any issue that could possibly taunt female officers. However, if I can read a passage from the Thrones of Desire, the female would, and I quote, take his cock in her hand and stroke its velvet length, squeezing him gently at first and then with more firmness. The passage goes on to state that the female character was, and I quote, thrilled at the noise of his pleasure and delighted to see his balls tighten and jettison their burden and spurts across his body. I believe that evidence that this can be destructive to the security and order of the prison and especially with the rehabilitation of sex offenders. For all other arguments, opponents rely on their briefs. Thank you. Very well. Thank you, counsel. We appreciate your appearance and argument today. Case will be submitted and decided in due course.